FILED

2015 MAY 27  AM 11: 11

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                  FOR THE CENTRAL DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,          CR No.  14-499(A)-PA

11                  Plaintiff,          F I R S T
                                        S U P E R S E D I N G
12             v.                       I N F O R M A T I O N

13   XILIN CHEN,                        [18 U.S.C. § 545:  Passing False
                                        Papers Through a Customhouse; 18
14                  Defendant.          U.S.C. § 1956(h):  Conspiracy to
                                        Launder Monetary Instruments; 18
15                                       U.S.C. § 1425:  Unlawful
                                        Procurement of United States
16                                       Citizenship]

17

18        The Acting United States Attorney charges:

19                              COUNT ONE

20                         [18 U.S.C. § 545]

21        On or about September 24, 2012, in Los Angeles County,

22   within the Central District of California, defendant XILIN CHEN

23   knowingly and willfully, with intent to defraud the United

24   States, made out and passed through a customhouse of the United

25   States, a false document, namely, a Customs and Border

26   Protection Form 7501 Entry Summary that stated the total value

27   of imported merchandise to be approximately $86,635.00, whereas

28   //

in truth and in fact, as defendant XILIN CHEN well knew, the true value of the imported merchandise was substantially greater than $86,635.00.

COUNT TWO

[18 U.S.C. § 1956(h)]

A.   GENERAL ALLEGATIONS

1.   On or about September 24, 2012, defendant XILIN CHEN was the registered owner of Yili Underwear, Inc., a California corporation ("Yili"), which operated as a lingerie import and wholesale business in the "Garment District" neighborhood of Los Angeles, California, within the Central District of California, and elsewhere.  The Los Angeles Garment District is a design, warehouse, and distribution nexus of the clothing, accessories and fabric industry in Downtown Los Angeles.  The Garment District spans approximately 90 city blocks and is the hub of the apparel industry on the West Coast of the United States.

2.   At all times between on or about September 24, 2012, until at least on or about December 13, 2012, defendant XILIN CHEN was the sole authorized signatory on an East-West bank account held in the name of Yili.

3.   In addition to Yili, beginning on a date no later than September 24, 2012, and continuing through on or about September 10, 2014, defendant XILIN CHEN also was an owner and/or operator of multiple other lingerie import and wholesale businesses located in the Garment District neighborhood of Los Angeles, California (collectively, Yili and the other Los Angeles, California garment import and wholesale businesses owned and/or controlled by defendant XILIN CHEN will hereinafter be referred to as the "defendant XILIN CHEN garment businesses").

//

//

**United States Customs and Border Protection**

4.   United States Customs and Border Protection ("Customs") is a federal agency under the Department of Homeland Security.  Among other things, Customs is responsible for regulating the importation of merchandise into the United States and for collecting any duty an importer owes on the merchandise so imported.

5.   As part of its responsibilities, Customs requires that the importers of merchandise must declare to Customs certain information related to all imported merchandise.  Among the information importers must declare, Customs requires that importers submit to an appropriate United States customhouse Customs and Border Protection Form 7501 Entry Summaries ("Forms 7501").  Each Form 7501 identifies a specific importation of merchandise by a unique "Entry Number," and each such Form 7501 requires, among other things, that the importer list the date the merchandise is exported from its country of origin, the date such merchandise is imported into the United States, the type of merchandise, the value of that merchandise, and a calculation of the duty to be paid on the imported merchandise.

6.   Customs relies upon the information the importer includes in Forms 7501 to assess the amount of duty an importer must pay on the imported merchandise listed in the Form 7501.

**The "Black Market Peso Exchange"**

7.   Financial institutions, typically for a fee, will wire-transfer funds between Mexico and the United States and will make such funds available in the national currency of each country, that is, in dollars in the United States and pesos in

1   Mexico.  Such financial institutions routinely maintain records
2   of these transfers, including records indicating the amounts
3   transferred and the identities of the individuals or businesses
4   associated with the transfer.

5        8.   In order to avoid the record-keeping and scrutiny
6   imposed by a legitimate financial institution, certain
7   businesses or individuals may choose to circumvent the
8   legitimate financial system and employ a currency broker, also
9   referred to as a "peso broker." A peso broker is an individual,
10  typically based in Mexico, who, through the use of an informal
11  and illegitimate money transfer system, charges a fee for
12  trading dollars held in the United States for pesos held in
13  Mexico.  Frequently, those who use peso brokers seek to avoid
14  scrutiny because the dollars they hold are derived from some
15  illegal source.  Very often, this illegal source of dollars is
16  the illicit sale of narcotics.

17       9.   From their illicit sales of narcotics in the United
18  States, international drug trafficking organizations generate
19  large amounts of cash, almost always in dollars.  Generally, the
20  individuals ultimately in control of such international drug
21  trafficking organizations are based outside of the United
22  States, and very frequently are based in Mexico.  In these
23  cases, in order to bring their illicit profits back to Mexico,
24  the drug trafficking organizations must exchange their cash
25  proceeds from dollars into pesos.  In order to avoid the
26  scrutiny that would come with converting such large amounts of
27  cash dollars into pesos, drug traffickers will often use the
28  unregulated and illegitimate money exchange system provided by a

1  peso broker to trade their dollars in the United States for
2  pesos in Mexico.
3      10.  To accomplish a trade such as this, the peso broker
4  works with an individual, such as a drug trafficker, who has
5  dollars held in the United States, but who needs to convert
6  those dollars into pesos held in Mexico.  Next, the peso broker
7  identifies individuals or businesses in Mexico seeking to
8  purchase merchandise from United States merchants who,
9  generally, only will accept United States currency in payment
10 for their merchandise.  The peso broker then identifies United
11 States-based vendors who will accept large cash dollar payments
12 for the merchandise sought by the Mexican individuals or
13 businesses.  The peso broker then arranges for the drug
14 trafficker's dollars in the United States to be delivered to
15 United States vendors where those dollars are used to pay for
16 the vendors' goods, which are ultimately delivered to the
17 Mexican customer.  In exchange for the dollars paid to the
18 vendors in the United States, the peso broker trades to the drug
19 trafficker an equivalent amount in pesos, which the broker
20 obtained from the Mexican customer that purchased the United
21 States merchandise.
22     11.  Under federal law, whenever a trade or business that
23 is not a financial institution receives over $10,000 in currency
24 in one transaction or two or more related transactions, the
25 business must file with the Secretary of the Treasury an IRS
26 Form 8300 ("Form 8300") to provide notice of such transaction.
27 Certain businesses may illicitly seek to avoid providing such
28

6

1  notice by creating multiple invoices for a single transaction,

2  each below $10,000.

3      12.  Frequently, in order to avoid scrutiny of their

4  illicit currency exchange, peso brokers will seek out United

5  States businesses that are willing to create multiple sub-

6  $10,000 invoices in an effort to avoid completing a Form 8300.

7  **B.  OBJECTS OF THE CONSPIRACY**

8      13.  Beginning on a date no later than September 24, 2012,

9  and continuing through on or about September 10, 2014, in Los

10 Angeles County, within the Central District of California, and

11 elsewhere, defendant XILIN CHEN and others known and unknown to

12 the United States Attorney, knowingly combined, conspired, and

13 agreed to commit the following offenses against the United

14 States:

15      a.  Knowing that property involved in financial

16 transactions represented the proceeds of some form of unlawful

17 activity, and which property was, in fact, the proceeds of

18 specified unlawful activity, that is, the proceeds from passing

19 false documents to a customhouse of the United States, in

20 violation of Title 18, United States Code, Section 545,

21 conducted and attempted to conduct financial transactions,

22 affecting interstate and foreign commerce, knowing that the

23 transactions were designed in whole or in part to conceal and

24 disguise the nature, location, source, ownership and control of

25 said proceeds, in violation of Title 18, United States Code,

26 Section 1956(a)(1)(B); and

27      b.  Believing that there was a high probability that

28 property involved in a financial transaction represented the

1  proceeds of some form of unlawful activity, and which property

2  was, in fact, represented by a law enforcement officer to be the

3  proceeds of specified unlawful activity, that is, the

4  represented proceeds of the distribution of controlled

5  substances, in violation of 21 U.S.C. § 841, conducted and

6  attempted to conduct a financial transaction, affecting

7  interstate and foreign commerce, knowing that the transaction

8  was designed in whole or in part to conceal and disguise the

9  nature, location, source, ownership and control of said

10  proceeds, in violation of Title 18, United States Code, Section

11  1956(a)(1)(B).

12  C.  **MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE**

13      **ACCOMPLISHED**

14      14.  In substance, the objects of the conspiracy were to be

15  accomplished, and were accomplished, as follows:

16          a.  Defendant XILIN CHEN and his co-conspirators,

17  acting by and through the defendant XILIN CHEN garment

18  businesses, regularly imported garments into the United States

19  from the People's Republic of China ("China") with the intention

20  of selling the imported merchandise through the wholesale

21  portion of the defendant XILIN CHEN garment businesses.

22          b.  When defendant XILIN CHEN and his co-conspirators

23  would import merchandise from China, they would submit to

24  Customs and cause to be submitted to Customs Forms 7501.  Based

25  on the value of the imported merchandise defendant XILIN CHEN

26  and his co-conspirators listed in the Forms 7501, defendant

27  XILIN CHEN and his co-conspirators would pay to Customs only the

28  duty described in the Forms 7501.

1       c.    Because of the competitive nature of the

2 wholesale business in the Los Angeles Garment District,

3 defendant XILIN CHEN and his co-conspirators sought to sell

4 their merchandise at prices below that of their competitors, and

5 any duty defendant XILIN CHEN and his co-conspirators paid to

6 Customs would be "passed-on" to the price of the merchandise the

7 defendant XILIN CHEN garment businesses would charge its

8 wholesale customers.

9       d.    In an effort to price their merchandise below

10 that of their competitors and gain an unfair advantage in the

11 marketplace, defendant XILIN CHEN and his co-conspirators

12 knowingly combined, conspired, and agreed that on certain

13 occasions they would create false invoices reflecting lower

14 costs for the merchandise so imported, when in fact, as

15 defendant XILIN CHEN and his co-conspirators well knew, the true

16 and correct value of the imported merchandise was an amount

17 substantially greater than the value defendant XILIN CHEN and

18 his co-conspirators indicated in the false invoices they

19 created.

20       e.    Following their creation of these false invoices,

21 defendant XILIN CHEN and his co-conspirators would submit and

22 cause to be submitted to a United States customhouse false Forms

23 7501 that would reflect the false and understated value of the

24 imported merchandise.

25       f.    As a result of their submission of false Forms

26 7501, defendant XILIN CHEN and his co-conspirators would pay and

27 cause to be paid to Customs less duty on the imported

28

1  merchandise than the true and correct duty owed on the imported

2  merchandise.

3       g.   From stores or warehouses owned or controlled by

4  defendant XILIN CHEN, defendant XILIN CHEN and his co-

5  conspirators would then sell such merchandise in bulk,

6  frequently accepting large cash payments for such sales, and

7  frequently to customers that defendant XILIN CHEN and his co-

8  conspirators knew would transport such merchandise to Mexico for

9  further sale or distribution.

10      h.   Notwithstanding the large sums of cash frequently

11  used to pay for such merchandise, defendant XILIN CHEN and his

12  co-conspirators would not question any of their customers who

13  would frequently insist on paying exclusively in cash and were

14  willfully blind as to the source of this cash.

15      i.   Having underpaid to Customs the correct and

16  appropriate duty owed on the imported merchandise, defendant

17  XILIN CHEN and his co-conspirators would sell such merchandise

18  for a greater profit than they would have realized had they paid

19  the appropriate duty.

20      j.   Following the sales of the under-reported

21  merchandise, defendant XILIN CHEN and his co-conspirators,

22  intending to conceal and disguise the nature, source, and

23  control of the proceeds of their fraudulent scheme, would

24  deposit the proceeds of these sales into multiple federally

25  insured financial institutions.

26      k.   Thereafter, further intending to conceal and

27  disguise the nature, source, and control of the proceeds of

28  their fraudulent scheme, and in perpetuation of that scheme,

1  defendant XILIN CHEN and his co-conspirators would use some or
2  all of their deposited illicit proceeds to purchase additional
3  merchandise from China for import into the United States, which
4  imported merchandise would again be undervalued in the Forms
5  7501 defendant XILIN CHEN and his co-conspirators would pass
6  through a United States customhouse.

7  D.   OVERT ACTS

8       15.   In furtherance of the conspiracy and to accomplish its
9  objects, defendant XILIN CHEN, and others known and unknown to
10 the United States Attorney, committed and willfully caused
11 others to commit, the following overt acts, among others, in the
12 Central District of California and elsewhere:

13      Overt Act No. 1:    On or about September 11, 2012,
14 defendant XILIN CHEN, as owner and president of Yili, caused to
15 be exported a shipment of garments manufactured in China, which
16 garments were listed in the Chinese garment manufacturer's
17 invoice.

18      Overt Act No. 2:    On or about September 24, 2012,
19 defendant XILIN CHEN, as owner and president of Yili, caused to
20 be prepared and submitted to Customs a Form 7501, which
21 identified the garments described in Overt Act No. 1 with the
22 Entry Number "W33 0793443-8," but which, as defendant XILIN CHEN
23 well knew, falsely listed the value of those garments at
24 $86,635.00, which value was substantially below the true and
25 correct value actually paid for those garments.  This Form 7501,
26 as defendant XILIN CHEN well knew, further falsely listed as
27 $14,489.58 the total amount owed by the importer to Customs for
28 the duty and related costs for this imported merchandise, which

11

1  duty was substantially below the true and correct duty owed to

2  customs for those garments.

3      Overt Act No. 3:    On or about September 27, 2012,

4  defendant XILIN CHEN, as owner and president of Yili, as a

5  result of having caused to be submitted to Customs certain

6  documents including the Form 7501 with the Entry Number "W33

7  0793443-8," caused to be imported for sale into the United

8  States the garments described in Overt Act No. 1.

9      Overt Act No. 4:    On or about October 12, 2012, defendant

10  XILIN CHEN, as owner and president of Yili, caused the Yili

11  East-West bank account to pay Customs $14,489.58, the false

12  total amount owed to Customs listed in the Form 7501 defendant

13  XILIN CHEN passed to a United States customhouse on September

14  24, 2012.

15      Overt Act No. 5:    Beginning on or about October 12, 2012,

16  and continuing until on or about December 13, 2012,

17  approximately $271,173.00 in cash was deposited into the Yili

18  East-West bank account, which deposits included illicit proceeds

19  derived from the sales of merchandise involved in the illegal

20  duty under-valuation scheme.

21      Overt Act No. 6:    Beginning on or about November 8, 2012,

22  and continuing until on or about December 13, 2012, defendant

23  XILIN CHEN, as owner and president of Yili, caused the Yili

24  East-West bank account to electronically wire transfer

25  approximately $150,000.00 to a garment manufacturer in China as

26  payment for garments to be imported for sale by the defendant

27  XILIN CHEN garment businesses in the United States.

28  //

<u>Overt Act No. 7:</u>    On or about September 18, 2013, defendant XILIN CHEN met with an undercover law enforcement agent posing as a drug trafficker who was seeking to use $10,625.00 in cash to purchase garments that purportedly would be later transported to Mexico.  During that transaction, in order to purchase merchandise from defendant XILIN CHEN, the undercover agent showed defendant XILIN CHEN a large quantity of cash packaged in plastic-wrap and concealed within a duffle bag. Knowing that there was a high probability that the undercover agent's possession of the large quantity of marijuana in a duffle bag related to drug trafficking, defendant XILIN CHEN deliberately avoided asking or confirming that the cash used to purchase the merchandise was the proceeds of drug trafficking. Defendant XILIN CHEN nevertheless agreed to accept from the undercover agent $10,625.00 in cash as payment for the sale of merchandise.   Thereafter, defendant XILIN CHEN directed one of his employees to create two separate invoices, each for under $10,000 but totaling $10,625.00, and defendant XILIN CHEN never filed with the Secretary of the Treasury a Form 8300 for such sale.

COUNT THREE

[18 U.S.C. § 1425]

On or about November 20, 2012, in Los Angeles County, within the Central District of California, defendant XILIN CHEN knowingly procured and attempted to procure, contrary to law, his naturalization, by making the following false material statement, which he knew to be false when made: that he had never committed a crime or offense for which he had not been arrested, when, in fact, he had committed such a crime and offense, including, Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h), and Passing False Documents to a Customhouse of the United States, in violation of 18 U.S.C. § 545.

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

JOHN J. KUCERA
Assistant United States Attorney
Asset Forfeiture Section

VICKI CHOU
Assistant United States Attorney
Organized Crime Drug Enforcement
  Task Force Section

14